IN

# THE SUPREME COURT

OF

# PENNSYLVANIA.

WESTERN DISTRICT—PITTSBURGH, 1888.

## THOS. MELLON ET AL. v. I. M. REED ET AL.

ERROR TO THE COURT OF COMMON PLEAS NO. 2 OF ALLEGHENY COUNTY.

Argued October 23, 1888—Decided November 5, 1888.

1. A will containing a direction to sell land at a time certain, for distribution, works a conversion of the land notwithstanding a subsequent provision authorizes the widow to postpone the sale, upon terms, as long as she may see cause or during widowhood.
2. The interest of a distributee in the land so converted may be sold and transferred by parol notwithstanding the statute of frauds, and his acts, declarations and admissions made at or about the time of such transfer are admissible as evidence thereof.
3. Though distributees, affected by such conversion, may together elect to take the land as an appropriation of their shares as upon a purchase, taking title not under the will but by their own act, yet prior to such election the interest of each is personalty and may be released or assigned without writing.
4. The purchaser of an interest in land from a beneficiary under a will, is affected with notice and put upon inquiry as to title by a provision of the will directing a conversion of the land, especially when the beneficiary has been out of possession for many years.*

Before GORDON, C. J., PAXSON, STERRETT, GREEN, CLARK, WILLIAMS and HAND, JJ.

---

* See Reed v. Mellor, 122 Pa. 635.

Statement of Facts.

No. 57 October Term 1888, Sup. Ct.; court below, No. 486 October Term 1884, C. P. No. 2.

On October 1, 1884, an action of ejectment was brought by Iolia M. Reed and Lavina B. Reed, by their guardian, Michael Dewalt, against Thomas Mellon and W. L. Scott, to recover the undivided one third part of fifty acres of land in Elizabeth township. The defendants' abstract filed, admitted title in the plaintiffs to the undivided one third of the surface of the land in dispute, and to the undivided one ninth of the coal underlying the same, tendering judgment; as to the residue of the plaintiffs' claim, they pleaded not guilty.

At a former trial of the cause on July 19, 1886, there was a verdict and judgment for the plaintiffs. The judgment was reversed on writ of error to No. 208 October Term 1886, and a venire facias de novo awarded: Mellon v. Reed, 114 Pa. 647.

At a second trial on January 3, 1888, the plaintiffs' case was in substance as follows:

Llewellyn Howell, Sr., died in 1823, seised of a tract of about 260 acres, including the land in dispute, and leaving a widow, Mary, and eight children, to wit: Esther, who married a Hindman, Martha and Sarah who married Armstrongs, and John, Llewellyn, Andrew, Philip and James. By his will, admitted to probate September 2, 1823, it was provided:

" And after all my just debts is paid, I devise and bequeath unto my loving wife Mary all my household furniture, likewise . . . . . as likewise the use of the farm until my son James arrives at the age of twenty-one years, except such property as has been named to my children yet at home by me, at which time the place is to be sold by my executors, and the two thirds of the proceeds to be equally divided to and amongst my heirs, and the one third to be at interest for the use of my said wife. But if in the opinion of my said wife such sale would be prejudicial to her interest she may detain the sale and possess the land by paying two thirds of the rent as long as she sees cause, or during widowhood. But if she should marry she is to have an equal part with one of the children. All the surplus property which will be remaining at the death of my said wife to be sold and the proceeds equally divided to

and amongst my children, together with the proceeds of the land when sold, except what of my children as have gotten property, which is to be considered out of their part."

The tract of land thus devised, which included the land in dispute, was not sold as directed by the will. The widow and children, except Andrew who had married and removed to West Newton, all lived together upon the farm until 1834 or 1835, when James became of age, married and removed to a farm by himself. In 1840 or 1841, John, Philip and Llewellyn, as was claimed by the plaintiffs, bought in the interests of James and of the other heirs in their father's estate, and then or soon afterward made a parol partition of the land among themselves, whereby about 129 acres, embracing the land in dispute, was set off by marked lines to Llewellyn Howell, and the remainder to Philip and John. To establish this purchase by John, Philip and Llewellyn, and the parol partition between them, the plaintiffs called Andrew Howell, one of the brothers, Daniel Kiehl, James S. Patterson, and other witnesses, who testified to declarations made by James admitting the sale of his interest, to the making of the division lines, and to possession taken and continued thereafter by the several parties. The testimony of the witnesses referred to, as evidence of a sale and transfer of James Howell's interest, was objected to by the defendants as incompetent and irrelevant. The objections were overruled, and the testimony admitted.[10] [11]

Llewellyn Howell, Jr., remained in possession of the land set off to him until his death in 1851, his mother then living with him. By his will, admitted to probate on February 6, 1851, he provided as follows:

" I will and bequeath unto my brother, Andrew Howell, the undivided one half part of the farm whereon I now reside, embracing and including the buildings, for and during his natural life, subject to the payment of the hereinafter bequests, and subject to mother's dower; and then, I will and devise the same unto his children, them, their heirs and assigns, but in case he, the said Andrew Howell, should die without issue, then, in that case, I will and devise the same unto my brother John Howell's children, to them, their heirs, and assigns, share and share alike. I will and bequeath unto my brother, James Howell, the undivided north half of the farm whereon I now

reside, embracing and including the mill property, for and during his natural life, subject to the payment of the hereinafter named bequests, and also subject to mother's dower, and at his death I will and devise the same unto his children, them, their heirs, and assigns, share and share alike."

Mary Howell, the mother, died about 1853. James Howell, the brother, died in 1880, leaving to survive him two children, Mary Howell and James R. Howell, and two grandchildren, Iolia M. and Lavina Reed, the plaintiffs in this suit, the children of a deceased daughter, Rachel Reed.

The plaintiffs having rested, testimony was introduced by the defendants, from which it was claimed that, after the deaths of both Llewellyn and their mother, John Howell took possession of the 129 acre farm which had been occupied by them, having purchased or contracted for the shares of all the heirs then interested, except of James and Andrew. In 1856 James and Andrew brought ejectment against John for the recovery of the land thus taken possession of. Before the trial Andrew sold his interest in the land claimed to John, and the cause went to trial by James alone against John. By agreement of the parties, in open court, a verdict was returned, awarding 50 acres of the land by metes and bounds to James, and giving to John 79 acres thereof.' This 50 acre parcel is the land in dispute.

In 1866, James Howell conveyed two undivided one third parts of all the coal under the said 50 acres of which he was then in possession, to Thomas Mellon in fee. In February and March, 1879, James Howell's two children, James R. and Mary, conveyed their interests in the entire 50 acres, surface and coal, to Thomas Mellon, in fee, and subsequently said Mellon sold and conveyed the coal underlying the tract to W. L. Scott,—these conveyances, as claimed by the defendants, leaving the heirs of Rachel Reed, the plaintiffs, entitled to one third of the surface and but one ninth of the coal thereunder.

The court, WHITE, J., after reviewing the evidence, charged the jury orally as follows:

Now the first question is : Did James sell out his interest in his father's estate to his brother Llewellyn ? You have the testimony, I believe, of two or three witnesses to his declara-

tions that he had sold it. Andrew Howell, I think, testified that James told him what he had got: a wagon and horses and things of that kind when he started farming, about $500 I think, but the jury will recollect the testimony, not take it from me. That would be in 1835 or 1836. Mr. Patterson testified that he said to him that he had got about $500, or had sold out for $500, or some expression of that kind. James had a perfect right to sell out his interest. Any of the children at any time could sell their interest in their father's estate. James of course could not do it while he was a minor, but as soon as he came of age he could sell his interest in his father's estate to his brother Llewellyn; and if he did so and got the full consideration for it, he could not afterwards claim the land under his father's will. [The will of the father directed the property to be converted into money as soon as James came of age. That is what is called in law a conversion from realty into personalty, and any heir that is entitled to a legacy or a division of money in the estate of the father can sell it or release it. It does not require a formal deed to do that, as this, under the will, was personalty—that is, money—because under the will it was to be sold when James came of age. He had a right to have it sold and to get his share of the money, unless his mother interfered to prevent it; or, he could sell out his portion under his father's will to one of his brothers, and if he did so and got the money in pursuance of such sale, then he relinquished all claim under his father's will and could not afterwards claim a portion of the land, whether he made a deed for it at the time he got the money or not.] [12]

Where land is left in this way, the heirs or legatees may elect to take it as land instead of money. It would seem, if you believe the testimony, that the three brothers, John, Philip and Llewellyn, claim to have bought the whole property, the farm of 260 acres, from the other heirs, and agreed to divide the land among themselves. They could not do that without the consent of their mother, because their mother had a right to her dower in it, and really to manage it while she chose to do so, paying over two thirds of the rents and profits to them. But if these three brothers had the whole interest of all the brothers and the sisters, they could say " We will not require this land to be sold, but we will divide it as land among our-

selves;" and if in pursuance of that they divided it among themselves and each went into possession of his portion and retained it, using it as his own for a number of years and improving it as such, it would be a binding arrangement and partition between them which neither one could oppose.

\*　\*　\*　\*　\*　\*　\*　\*

To repeat: When James came of age he could sell out his interest in his father's estate to his brother Llewellyn, and if he did sell it and got the money for his interest, and after that the three brothers having bought out all the other heirs and agreed to take the land as land and divide it among themselves and so did, then James had no further interest in the land of his father's estate. It is a question of fact for you, gentlemen of the jury, whether James did sell out his interest in his father's estate. If he did, and if John, Philip and Llewellyn bought out all the other heirs, then they had a right to make a parol partition between them, that is, a partition not in writing; and if these three brothers did divide the 260 acres into two parts, James taking one and John and Philip taking the other, and if in pursuance of the parol arrangement between themselves each went into possession of his own part, and they settled and marked a line between them and each retained and improved his own part for years afterwards, that would be a binding partition between the three brothers that neither one could break up or destroy. If such were the facts in the case, then in 1851, when Llewellyn died, he had a perfect fee-simple title to the 129 acres that he died seised of, and he had a right to will it to whom he pleased. He did will it to Andrew and James for their lives, and at their death to go to their children. That would simply give James and Andrew a life estate, and under that life estate James would have no right to sell the coal or any part of it.

Now we come to the action of ejectment in 1856. As I have said, Llewellyn died in 1851, leaving the will which I have referred to; and I would infer that John and some other parties in some way got possession of the portion that Llewellyn had died seised of, because we find Andrew and James, the two devisees in Llewellyn's will, bringing that action of ejectment against them in 1856, some four or five years after Llewellyn's death. The mother had lived probably two years

after Llewellyn's death, and it was three years after her death when that action of ejectment was brought. For what purpose was that brought? Was that action of ejectment to recover James' undivided interest in his father's farm, or was it simply to recover the portion that Llewellyn had died seised of and held in severalty? [It would seem from some deeds in evidence that after Llewellyn's death in 1851, John got some releases from some of the other heirs, but that no releases had ever been executed by any of the heirs until after Llewellyn's death in 1851.] [12] At all events, in 1856 John and some of the other parties seem to have been in possession of this tract of land. The praecipe and verdict in the case strike me as pretty strong evidence that that action was not brought to recover any undivided interest that James or Andrew had in their father's estate. If they had an interest it would be an undivided interest in the 260 acres. They would not be entitled, as heirs under their father's will, to any portion of it to the exclusion of the other heirs, even of John and Philip. They could go into the Orphans' Court and ask for a partition, alleging that their father died in 1823, alleging the number of acres there were in the farm, their father's will, and that under it they were each entitled to one eighth. But in 1856 they brought this action of ejectment for the 129 acres that Llewellyn had lived on and died seised of in severalty, so described in the praecipe which gives also the boundaries of the 129 acre tract, bounding it on one side by land of John Howell, the other brother. It is true that that is not conclusive on the subject, especially under the verdict that was rendered in that case, but to my mind it is pretty strong evidence, as I said, that that action of ejectment was not brought to recover any undivided interest in the whole farm of 260 acres. The verdict was entered by consent of the parties in interest, and the form of the verdict is such that it would not probably have been received by the court, unless it had been agreed upon by the parties. If Andrew and James were entitled to the 129 acre tract under the will of Llewellyn, each one was entitled to one half of it, because the will provided that one half should go to James and one half to Andrew. The verdict, however, sets apart 50 acres to James and the balance to the defendants. That seems to cut out Andrew entirely; but I

think Andrew's testimony explains that, that after the suit was brought he compromised with John, so that in that way nothing but James' interest was left to be determined. The verdict reads, "And we find for the plaintiff, James Howell, 50 acres to be run off the northern part of the land described in the writ as follows;" then it goes on to describe it and provides that he shall pay certain legacies in the will of Llewellyn Howell, and that he shall release to John the rest of the ground, and then finds for the defendants for the balance of the tract of land. I say, therefore, that it seems to me that this action of ejectment was brought to recover that tract of land that Llewellyn had obtained by the partition between him and his two brothers, John and Philip, and which he had willed to his two brothers, Andrew and James, for life, and to their children; and Andrew and James having a life estate would be entitled to bring their action of ejectment to recover possession. [I make the further remark here, bearing on the question of whether Mr. Mellon had notice of this title or not: the purchaser of land must always be on his guard. It is true that when there are some latent equities or some title not of record, he may be able to defeat parties setting up such an equity or such a latent title, but whenever the purchaser has notice or something that will put him upon inquiry and he buys under such circumstances, he buys at his peril.] [12] Now, it seems to me that Judge Mellon would examine the title of James Howell. What title had James Howell? There was no deed on record to James Howell. There was the will of his father in 1823, and this was in 1856, some 33 years after his father's death. The will provided that the property was not to be sold until James came of age. This was more than twenty years after he came of age. I am speaking of the action of ejectment. In the first place, the praecipe setting forth and claiming possession of 129 acres, not an undivided interest in 260 acres, but claiming absolutely the 129 acres; and then the verdict referring to the will of Llewellyn Howell and the paying of certain legacies under it, seems to me to be enough to put the purchaser upon inquiry, and if he found out afterwards that James Howell had not a good fee-simple title he would have no ground of complaint.

If, then, gentlemen of the jury, you find that James Howell

did sell out his interest in his father's estate to his brother
Llewellyn about the time he got married, and that the three
brothers, John, Philip and Andrew, bought out the other heirs
and then did make a partition between themselves of the land,
and that Llewellyn got this portion and kept it for a number
of years as his own, John and Philip living on the other por-
tion, and that Llewellyn died in possession of it, then Llewel-
lyn had a perfectly good title, in fee simple, to that property,
clear of any claim on the part of any of his brothers or sisters.
And if you find that the action of ejectment in 1856 was for the
recovery of that very land that Llewellyn thus held and willed
to his brothers, then your verdict ought to be for the plaintiffs
for the one third of the land and the one third of the coal. If,
however, you find that James never did sell his interest to his
brother, and that the action of ejectment of 1856 was to re-
cover his interest in his father's estate as well as what he was
entitled to under his brother's will, then the verdict should be
for the plaintiffs for only the one ninth of the coal. One third
of the land is still admitted to belong to the plaintiffs. The
controversy really is simply as to the coal: whether the plaint-
iffs are entitled to one third or one ninth of the coal.

The defendants' points are answered as follows:

1. Under the will of Llewellyn, Sr., his widow Mary had
the right to possession and control of the farm, and there is
no sufficient evidence to show that she ever lost that right or
abandoned it and did not continue to hold the northern part
of the farm under it till the time of her death.

Answer: The first part of the point is affirmed. But
whether John, Philip and Llewellyn bought out the interests
of the other heirs, and with the consent of the mother elected
to take the farm as land, and made an amicable partition, is a
question of fact under the evidence for the jury.[1]

2. At the date of the deed in fee to Mellon for two thirds
the coal underlying the 50 acres set apart to James, pursuant
to agreement in ejectment, the evidence shows a complete
record title in John Howell for thirteen sixteenths, and in
James for three sixteenths of the whole farm of their father;
a partition between them by a consentible verdict and judg-
ment and releases in accordance with these their interests;

Charge of Court below.

and possession taken by James of the land in question allotted to him under said judgment, and that possession continued till the time of his death, and claiming to hold and dispose of two thirds thereof in fee.

Answer: Refused.[2]

3. The legal inference from the verdict and judgment and releases in pursuance thereof in evidence, is that John's thirteen sixteenths and James' three sixteenths in the whole farm was relegated to and limited in the parts awarded to each respectively, by the verdict and judgment aforesaid.

Answer: Refused.[3]

4. The uncontroverted evidence shows Mellon, and Scott holding under him, to be bona fide purchasers for value without notice, either direct or constructive, of the parol title set up by the plaintiffs.

Answer: Refused.[4]

5. The plaintiffs have failed to show title from James to Llewellyn Howell, such as would affect the defendants.

Answer: Refused.[5]

6. Plaintiffs' evidence fails to show such title as would affect defendants as regards James Howell's one eighth part in the father's farm in fee under his father's will.

Answer: Refused.[6]

7. The evidence of parol partition as between Llewellyn, John and Philip, was inter alios acta as to James, and it and the evidence of loose and uncertain declarations by James of a parol sale to Llewellyn, Jr., is wholly inadequate to take the case out of the statute of frauds, or to affect defendants' title; the plaintiffs are therefore entitled to recover only under their record title, viz.: one third part of the surface and one ninth part of the coal.

Answer: Refused.[7]

8. The deeds of the five heirs who conveyed to John are not impeached for fraud, and the loose declarations of James or others, not made at the execution of those or of his own deed to Mellon, or brought to Mellon's knowledge, cannot avoid or set them aside.

Answer: Refused.[8]

9. The verdict and judgment in evidence are essential to the title in severalty in James for the coal he conveyed to Mellon;

and the deeds of the other five heirs who conveyed to John are essential to the maintenance of that verdict and judgment; and such a paper title on record cannot be set aside by parol evidence of the quality here presented.

Answer: Refused.[9]

10. The plaintiffs' claim to any more than one ninth the coal and one third the surface depends on setting aside these deeds by an alleged prior parol sale or agreement to sell to Llewellyn.

Answer: Refused.

If you find for the plaintiffs you will find the one third undivided interest in the property described in the writ, including one third of the coal.

If you find for the defendants, you will find for the plaintiffs the one third undivided interest of the surface and the one ninth undivided interest of the coal.

The verdict returned was for the plaintiffs " for the undivided one third of the coal and surface described in the writ, with six cents damages and costs." Judgment having been entered upon the verdict, the defendant took this writ assigning as error:

1-9. The answers to the defendants' points.[1 to 9]

10, 11. The admission of plaintiffs' offers.[10 11]

12. The parts of the charge embraced in [ ][12]

*Mr. J. McF. Carpenter*, for the plaintiffs in error:

1. From the opinions in Mellon v. Reed, 114 Pa. 647, and Bailey v. Allegheny N. Bank, 104 Pa. 425, and the authorities on which they are based, we take the law to be that land devised to executors or conveyed to trustees to be sold for distribution among beneficiaries, becomes personalty only for distribution among the beneficiaries and their representatives, but never loses its legal attributes, as to transfer of title. The statute of frauds does not apply to the proceeds either before or after conversion, but it does apply to the land. The legal title remains in the executors or trustees until they transfer it to the vendee, or until the facts raised the presumption that the beneficiaries had elected to take the land instead of the money. The law then vests the title in the beneficiaries and their vendees, by reason of the implied execution of the

trust, and relates back to the institution of the trust, leaving no hiatus for the existence of personalty. Hence, the statute of frauds attaches to the land all the time. In the present case, no conversion ever took place. The power to convert was optional and conditional, which worked no conversion, and all parties in interest elected to take the land instead of money from first to last.

2. The deeds of the three sisters and of Philip and Andrew to John, are material as the foundation for the settlement and partition made between James and John in the ejectment of 1856. Statements of James that he had sold to Llewellyn were admitted to invalidate his deed to Mellon. Such testimony is insufficient to set aside a vested record title where the interests of third parties have intervened: Jackson v. Payne, 114 Pa. 67. Moreover, it is settled beyond controversy that the transfer by one tenant in common to his co-tenant of his interest in land, comes directly within the statute of frauds: Galbreath v. Galbreath, 5 W. 146; Brawdy v. Brawdy, 7 Pa. 161; Christy v. Barnhart, 14 Pa. 262; Arnold v. Cessna, 25 Pa. 43; Workman v. Guthrie, 29 Pa. 495. Positive power to sell in a will works a conversion for purposes of distribution, but even then the share of a distributee can be mortgaged: Bailey v. Allegheny N. Bank, 104 Pa. 425. To effect the conversion of land into money, under the terms of a will, the power to sell must be absolute and unconditional: Stoner v. Zimmerman, 21 Pa. 394; Henry v. McCloskey, 9 W. 145; Bleight v. M. & M. Bank, 10 Pa. 132.

3. But call this land personalty; still, when Mellon purchased and paid for two thirds of the coal, there was nothing to show that Llewellyn's prior possession of it was in pursuance of a purchase from his brothers and sisters. That possession was consistent with the domestic relations of the parties, and with the paper or record title of the parties as theretofore existing. Whether regarded as a piece of furniture or a chose in action, there was no such change of possession or other indications as would bring notice home to Mellon that the sisters and brothers had sold to Llewellyn before they sold to John: Hendrickson's App., 24 Pa. 363; Wetherill's App., 3 Gr. 281; Mellon's App., 96 Pa. 475.

*Mr. R. E. Stewart* (with him *Mr. E. P. Douglass*), for the defendants in error:

1. The evidence showed, first of all, the seisin in fee by Llewellyn Howell, Sr., at the time of his death, of a tract embracing the land in controversy, and a disposition of the same by a will which gave none of his children any estate in or title to the land as such, but which required an agreement on the part of all interested in the proceeds thereof, under the will, to waive the sale thereof directed by the will, and take the land itself in lieu of its proceeds, before any title to the land could be acquired. No evidence of any such agreement or election by all the children of Llewellyn Howell, Sr., appeared in the case. The evidence did show a sale and disposal of their respective interests in their father's estate by five of the children to the other three, namely, to Llewellyn, John and Philip; valuable improvements made on the land thereafter by these three brothers, followed by a partition thereof; a tenure thereafter by them of their respective purparts as their own properties and further valuable improvements made; the death of Llewellyn about fourteen years after the partition, seised in severalty of his allotment, which comprised one half of the original tract and included the land in controversy; and the devise by the said Llewellyn Howell, Jr., by a will duly probated and of record in the proper office, of a part of his land, embracing the land in controversy, to his brother James (under whom defendants below claimed title) for his life only, and the remainder in fee to his children, as the heirs of one of whom the plaintiffs below claimed title.

2. As to the fourth specification of error, which alleges error in the court's refusal to charge that "the uncontroverted evidence shows Mellon, and Scott holding under him, to be bona fide purchasers for value without notice, either direct or constructive, of the parol title set up by the plaintiffs," it may be sufficient to say, that at the time Mellon negotiated with James Howell and took a deed from him for an interest in the coal, James had no record title except that shown by the will of Llewellyn Howell, Jr.; the will of his father gave him no title to any interest in the land as such, and there had been no election in which he had concurred to take the land. Moreover, the title of the plaintiffs below was not a parol title: the will

of Llewellyn Howell, Jr., was a matter of record and directed attention to the title vested in him in his lifetime and at the time of his death, and of which his long possession of the land was notice to all the world.

OPINION, MR. JUSTICE CLARK:

The first question which arises in this case is whether or not, by the terms of the will of Llewellyn Howell, Sr., deceased, there was an equitable conversion of the realty into personalty.

The use of the land was devised to his wife, Mary, until his son James should arrive at the age of twenty-one years; "at which time," in the words of the will, "the place to be sold by my executors, and the two thirds of the proceeds to be equally divided to and amongst my heirs, and the one third to be at interest for the use of my said wife;" "but," says the testator, "if in the opinion of my said wife, such sale would be prejudicial to her interest, she may detain the sale, and possess the land, by paying two thirds of the rent, as long as she sees cause, or during her widowhood; but, if she should marry, she is to have an equal part with one of the children; all the surplus property, which will be remaining at the death of my said wife, to be sold, and the proceeds equally divided to and amongst my children." It is conceded, on all hands, that the first of these clauses, if it had not been qualified by the second, would have worked a conversion; but the plaintiffs in error contend that the two clauses, taken together, cannot have that effect. It is certainly true that a direction to sell must be absolute and unconditional: Stoner v. Zimmerman, 21 Pa. 394. It must be imperative, not contingent or discretionary merely, or a conversion does not take place until the sale is actually made: Peterson's Appeal, 88 Pa. 397; Hunt's Appeal, 105 Pa. 141. But the language of this will is imperative. The sale of the land is in no way dependent upon the discretion of the widow, excepting as to the time when it may be made. She has power "to detain" the sale, but not to defeat it. Sooner or later, if the directions of the will are pursued, the sale must take place. She might have "detained" the sale during her lifetime, but the power to sell was not contingent or conditioned upon her consent. At her death, therefore, the direction was absolute, and this was sufficient: Allison v. Wilson, 13 S. & R. 330; McClure's Appeal, 72 Pa. 414.

This case is readily distinguishable from those cited by the plaintiffs in error: Henry v. McCloskey, 9 W. 145, and Stoner v. Zimmerman, supra, where the sale was expressly conditioned upon the consent of the testator's wife. That consent, of course, she had the power to withhold; and in that event there was no authority to sell, either in her lifetime or after her death. The power in both cases was contingent, and it was held that there was therefore no conversion.

When the case was here before it was meagerly presented in the proofs. We then said: "The provision for his children was a bequest of the proceeds of the sale of the land by his executors, and in a devise of the land itself it was the right of the parties interested in the event, at their election, to accept the land unconverted; and this, it is not denied, was done. Thereby they became tenants in common of the lands, subject to the estate and right of the widow therein." Both parties then seemed to assume the equitable conversion of the land into money, and that the heirs had elected to take the land as land instead of the money, and we disposed of the case accordingly.

Now, however, there is evidence tending to show that the first decisive act of the heirs towards a re-conversion was the parol partition in 1840 or 1841; that this partition was a matter between John, Philip, and Llewellyn, Jr., only; that these three had previously purchased the shares of the other heirs, and with the widow's consent divided the land between them. The only one of these transactions we have anything to do with, in this case, is the alleged purchase of James' interest, which was made in 1840 or 1841, at or about the time of the partition. The tendency of the proofs is to show that it was before the partition; as James, although probably 30 years of age, was present, took no part in the partition, and does not appear to have made any claim to the land. It appears that James had previously married, and was about to remove to the Graham farm, and the plaintiffs' allegation is that at this time Llewellyn purchased James' interest in his father's estate. Andrew Howell, one of the brothers, testifies as follows: "I left the homestead in April, 1832. I moved to Rostraver township, Westmoreland county. In 1831, when I was going to leave,—the year before I left,—he (Llewellyn) told me

he would give me a wagon, and get it ironed. He got me a lot of harness, and rigged me out for farming, and my two horses. I got a couple of horses from him. When I moved away, he gave me a cow and a shoat, or a young sow. He gave me these things for the interest I claimed to have in my father's farm. He purchased all the girls' interests. I cannot tell when my brother James left home. I do not exactly know what year my brother James got married. He must have moved on the Graham farm about 1840 or 1841. That was when he left home after he was married.

"Q. Do you know, of your own knowledge, or from any conversation with your brother James, whether or not he had disposed of his interest in his father's farm? A. He told me that he had, and that Llewellyn was helping him to start on the Graham farm, the same as he helped me. I had this conversation with him here, in West Newton, shortly after he moved to the Graham farm. After Llewellyn died, James and I had a conversation here in town. He allowed to me that Llewellyn had given me more than he had him. This was after Llewellyn died, and we knew the contents of his will.

"Q. What gave rise to this conversation? A. We began to talk what Llewellyn had given him and me. Llewellyn had given me the part that had the buildings on. He complained that I had got more than I ought to have got, getting the buildings. He gave no reason, only that I had got the half of the farm and the buildings."

Daniel Kiehl testifies that shortly after James was married, and after he had moved on the Graham farm, James told him that his brother Llewellyn had bought his interest in the old farm—in his father's farm. James S. Patterson testifies that James told him several times that he had sold out his interest; that he told him this just after he was married; also, after Llewellyn's death and at another time, after James had recovered the 50 acres in the ejectment; but that he said he had given no release. This witness having been requested to state particularly the conversation between himself and James, after James had acquired the 50 acres in the ejectment suit, says: "Well, he commenced the conversation in this way, in the woods there: He was telling me about what had happened before he came in possession of it; that John and Llewellyn had paid him, but they had not got any release from him.

"Q. He said Llewellyn had paid him? A. Yes, sir; but had not got a release before Llewellyn died, and then, when Llewellyn died, John wanted him to sign a release, and he would not sign it. That was just what was said.

"Q. Did he state the reason why he would not sign it? A. He thought John had not any right to it in his name; he thought it had to be in Llewellyn's name also."

The purchase of James' interest by Llewellyn is established, if it is established at all, wholly by parol proof. There was no writing between them, and it is contended that the transaction falls within the provisions of the statute of frauds. We have already said that, by the terms of the will of Llewellyn Howell, Sr., deceased, there was an equitable conversion of the realty into personalty; that the interest of the heirs was therefore personal, not real; the title to the land was in the executors, and the heirs were entitled to the proceeds only. It is true that, if all the parties in interest had joined with James, equity would have allowed them to take the land in lieu of the money; not that they had any equitable interest in the land, under the law, but, being the only parties beneficially interested, they had power to control the event. In such a case, the heirs take title, not by the will, but by their own act. Their election to take the land is an appropriation of their interests under the will to the acquisition of the land, as upon a purchase, and an equitable estate or title is thereby created in them, which chancery will execute by compelling a conveyance. But until the act of election the heirs have no estate or title which would be the proper subject of a lien, either by judgment or by mortgage, or which could be taken in execution. In Bailey v. Allegheny N. Bank, 104 Pa. 425, a mortgage executed under such circumstances was treated as a provisional election to take the land, contingent upon the agreement of the other heirs to unite therein, and in the meantime as an equitable assignment of the interest of the heir as personalty, which, after partition, attached as a lien to the purpart allotted to the mortgagor in severalty. To the same effect is Horner's Appeal, 56 Pa. 405. In all the cases, however, the interest of the heir prior to the election to take as realty, has been regarded as a mere chose in action, and we can discover no reason why it cannot be released or assigned

in the same manner as other choses in action. No case has been brought to our notice in which it has been held that such an assignment falls within the provisions of the statute of frauds, and must therefore be in writing. The statute of frauds applies to all leases, estates, or interests in lands, tenements, or hereditaments, and its provisions have been carried to every interest, legal or equitable, therein; but it can have no application in the transfer of personal property.

Whether or not James Howell sold his interest under his father's will to Llewellyn, his brother, as alleged, was therefore a question of fact, to be resolved by the jury, and, as there was evidence from which we think the fact could be fairly inferred, the question was properly submitted. The evidence of the purchase of the shares of the other heirs, it is true, is very slight, but that is not a material fact in this case. It is the purchase of James' interest which is controverted here. That John afterwards took releases from his brothers and sisters to confirm his title is of little consequence, if the purchase of James' interest by Llewellyn was established to the satisfaction of the jury.

There was evidence, however, to show that John, Philip and Llewellyn, claiming to own all the interests of their brothers and sisters, in 1840 or 1841, treating the proceeds of the land as land, made a parol partition; Llewellyn taking one portion thereof according to a line marked on the ground in severalty, and John and Philip the residue; and that they possessed and held the same, pursuant thereto, until the time of Llewellyn's death in 1851. This partition was made in the lifetime of the widow, while she lived upon the land; and, as the purparts were kept and cultivated by the brothers named, respectively, according to the line designated, without objection on her part, and without payment of rent by her, as provided in the will, it may well be inferred that the partition was made with her consent.

It is contended, however, that the will of Llewellyn Howell, Sr., and that of Llewellyn Howell, Jr., taken together, show title in James Howell for three sixteenths of the whole tract, whilst the action of ejectment exhibits a recovery by James of 50 acres in severalty, in lieu of his undivided interest in the whole; that, this being the condition of the record, Mellon

and Scott were bona fide purchasers, to that extent, without notice of the parol arrangement between James and Llewellyn, if any existed, and that they are upon that ground entitled to recover according to the showing of the record. The fallacy of this argument consists in this : that the will of Llewellyn Howell, Sr., did not exhibit any title whatever in James Howell. Under that will he was a legatee merely of a share of the proceeds in the land. This was certainly sufficient to put purchasers on inquiry as to the condition of the title, especially as James had abandoned the possession, and the land had been in the exclusive occupancy of his brothers, according to a certain line of division marked on the ground and recognized between them, from the year 1841 to the time of their purchase in 1866. The evidence of this partition was not res inter alios acta. It was relevant to the issue in this case, in so far as it tended to establish title in James Howell under the will of Llewellyn Howell, Jr., deceased, and in that way to explain his recovery in the ejectment.

Upon a careful examination of the whole case, we think the errors assigned are not sustained, and that the case was properly submitted to the consideration of the jury.

The judgment is affirmed.

